**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-61755-CIV-ALTMAN/Hunt**

**SEAHORSE OCEANSIDE APARTMENTS**
**CONDOMINIUM ASSOCIATION, INC.,**

       *Plaintiff,*

v.

**HOMESITE INSURANCE COMPANY,**

       *Defendant.*

_____/

**AMENDED ORDER GRANTING THE DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT[1]**

**THE DEFENDANT** filed a Motion for Summary Judgment (the "Motion") [ECF No. 33], the Plaintiff responded (the "Response") [ECF No. 39], and the Defendant submitted its reply (the "Reply") [ECF No. 41]. The parties presented their oral arguments at a hearing on February 19, 2020. The Court has carefully considered the parties' briefs, the record, and the governing law and, for the following reasons, now **GRANTS** the Defendant's Motion.

**THE LAW**

In 1968, hoping to create a "unified national program for flood" insurance, Congress passed the National Flood Insurance Act ("the Act"), 42 U.S.C. § 4001, which placed the Federal Emergency Management Agency ("FEMA") in charge of the National Flood Insurance Program (the "NFIP"). *See* 42 U.S.C. § 4081. As relevant here, the Act authorizes FEMA to use private corporations—called Write-Your-Own insurance carriers ("WYO carriers")—to issue flood insurance policies. *See* 42 U.S.C. § 4081(a) (permitting FEMA director to enter arrangements with

---

[1] The Court issues this Amended Order to correct a typographical error in the Original Order.

private insurance companies to use their "facilities and services"); 44 C.F.R. § 62.23(a)–(d) (allowing private insurers to sell and administer insurance policies through the WYO program). These policies—called Standard Flood Insurance Policies ("SFIP")—are themselves written by Congress, *see* 44 C.F.R. Part 61, App. A(1), and are underwritten by the United States Treasury, *see* 42. U.S.C. § 4017(a). In this way, the WYO carrier is a "fiscal agent" of the United States, *see* 42 U.S.C. § 4071(a)(1), and must remit all insurance premiums to FEMA, *see* 44 C.F.R. Part 62, App. A, Art. VIII(B). Because of this relationship between the WYO carrier and the government, the carrier may not amend or alter the terms of an SFIP without FEMA's express written consent. *See* 44 C.F.R. Part. 61, App. A(1), Art. 9(D).

Nevertheless, SFIPs are still contracts, and their construction is "governed by federal law, applying 'standard insurance law principles.'" *Wright v. Dir., Fed. Emergency Mgmt. Agency*, 913 F.2d 1566, 1571 (11th Cir. 1990) (cleaned up). "FEMA's administration of the insurance program does nothing to alter the status of [SFIPs] as insurance contracts." *Id.* at 1570. And, because SFIPs are issued all over the country, "SFIP contracts [must be] interpreted using principles of federal common law rather than state contract law." *Newton v. Capital Assur. Co.*, 245 F.3d 1306, 1309 (11th Cir. 2001).

But, because SFIP claims are paid directly from the U.S. Treasury, the interpretation of SFIP contracts differs from standard contract interpretation in one salient way: federal courts must "strictly construe" their terms and conditions. *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 432 (1990). This principle finds its roots in the Appropriations Clause of the U.S. Constitution, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Clause was meant "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress

as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Richmond*, 496 U.S. at 428. It is for this reason "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947). Thus, before a court may authorize the payment of an SFIP claim, "Strict Compliance with Policy Conditions" is required. *Sanz v. U.S. Sec. Ins. Co.*, 328 F.3d 1314, 1317 (11th Cir. 2003). "[N]ot even the 'temptations of a hard case' should cause courts to read the requirements of a federal insurance contract with 'charitable laxity.'" *Id.* at 1318 (quoting *Merrill*, 332 U.S. at 386).

## THE FACTS

The Defendant, Homesite Insurance Company ("Homesite"), is a WYO carrier authorized to administer SFIPs under the NFIP. *See* Homesite Insurance Company's Statement of Material Facts in Support of Summary Judgment (the "Homesite SOF") [ECF No. 34] ¶ 4.[2] The Plaintiff, Seahorse Oceanside Apartments Condominium Association ("Seahorse"), is the "owner of a 19-unit beachfront condominium building" in Hollywood Beach, Florida. *See* Plaintiff's Statement of Material Facts (the "Seahorse SOF") [ECF No. 38 at 3–5] ¶ 1. On April 30, 2017, Seahorse either purchased or renewed a "Residential Condominium Building Association" SFIP from Homesite. *See* Resp. Ex. A (the "Contract") [ECF No. 39-1] at 1. By that Contract, Homesite promised to provide Seahorse with flood insurance through April 30, 2018. *See id.*[3]

---

[2] Seahorse disputes only two paragraphs—18 and 20—of Homesite's Statement of Facts. *See* Seahorse Response to Defendant's Statement of Facts (the "Seahorse Response SOF") [ECF No. 38 at 1–3] ¶¶ 18, 20. Both paragraphs involve the Contract's proof-of-loss requirement. Because the remaining paragraphs of the Homesite SOF are undisputed—and thus "deemed admitted," S.D. Fla. L.R. 56.1(c)—the Court will refer primarily to the Homesite SOF throughout this Order.

[3] *See also* Homesite SOF ¶ 2 (identifying flood policy number "3000061526, having building limits of $3,643,300 subject to a deductible of $2,000, and insuring the property identified as 201 Van Buren Street, Hollywood, FL 33019 with effective dates of April 30, 2017 to April 30, 2018").

On September 30, 2017, Hurricane Irma made landfall on the east coast of Florida. *See* Seahorse SOF ¶ 1. The storm caused catastrophic damage along Florida's entire shoreline, including in Hollywood Beach, where the Seahorse condominiums are located. *See id.* After the storm, Seahorse's property manager and its board members went out to view the property and made a preliminary assessment of the damages. *See id.* Seahorse then filed a claim with Homesite for benefits under the SFIP. *See* Homesite SOF ¶ 6. Homesite assigned an independent claim adjuster—James Dwyer of Colonial Claims—to handle the claim. *See id.* ¶ 7. After an inspection of the property, Dwyer prepared an estimate of the damages. *See id.* ¶ 8. Based on that estimate, Homesite paid Seahorse $13,419.61. *See id.* ¶ 9.

Unsatisfied with that payment, Seahorse hired Paul Orr of Nutek Engineering to conduct a formal assessment of the damages and to issue a report. *See* Homesite SOF ¶¶ 13–15; Seahorse SOF ¶¶ 1–2; *see also* Seahorse SOF Ex. 1 ("Orr Summary") [ECF No. 38-1]; Homesite SOF Ex. 4 ("Orr Expert Report") [ECF No. 33-4]. Orr determined "that the damage to the building's structural foundation and outside walls and concrete canopies was caused by Hurricane Irma's storm surge and flood waters." Seahorse SOF ¶ 2. He also opined that Irma "deposit[ed] 2 to 3 ft of sand on the Boardwalk in front of the Seahorse Building" and "raised the level of groundwater to the point where it weakened the soil['s] ability to hold weight[] and shifted the piling slightly to allow the building weight to crack the foundation." Orr Summary at 1.

Armed with the Orr Summary, the President of the Seahorse Condominium Association—Sharon Usinger—sent Homesite a claim for additional benefits under the SFIP. *See* Homesite SOF ¶ 15; Seahorse SOF ¶ 3. Homesite then hired Steven Pace, an engineer with Donan Engineering, to conduct an independent inspection of the property. *See* Seahorse SOF ¶ 4; Homesite SOF ¶ 12. Pace concluded that "the cracks to the foundation claimed by the Plaintiff were from spalled or

missing concrete and corroded reinforcing steel, and the damages claimed to the front entrance awning were historical." Homesite SOF ¶ 12. Because of its engineer's conclusion that the damages were not caused by Irma, Homesite denied the claim on January 13, 2018. *See* Homesite SOF ¶ 15.

Hoping to salvage Seahorse's claim, Usinger then sent Pace and Homesite a 2016 report on the property, in which Orr had assessed the building's structural integrity. *See* Seahorse SOF ¶ 6. On March 30, 2018, after having reviewed the 2016 report, Homesite issued its second denial of coverage. *See* Homesite SOF ¶ 16; Seahorse SOF ¶ 8.

After this second denial, Seahorse hired a public adjuster—Brad Johnson of Brodsky and Associates—who estimated that the total cost to Seahorse of the Irma-related flood damage was $167,302.00. *See* Seahorse SOF ¶ 7; *see also* Seahorse SOF Ex. 6 (the "Johnson Report") [ECF No. 38-6]. Two days later, on April 27, 2018, Homesite denied coverage for a third (and final) time. *See* Homesite SOF ¶ 16; Seahorse SOF ¶ 8.

On July 23, 2018, Seahorse sent Homesite—via certified mail with return service requested—its sworn proof-of-loss statement. *See* Seahorse SOF ¶ 9. Seven days after that, on July 30, 2018, Seahorse filed this Complaint. *See* Complaint [ECF No. 1] at 1.

On August 20, 2018, Seahorse's proof of loss was returned as undeliverable because Seahorse had addressed it to the wrong zip code. *See* Seahorse SOF ¶ 11; *see also* Seahorse SOF Ex. 8 (the "First Proof of Loss") [ECF No. 38-8]; Seahorse SOF Ex. 9 [ECF No. 38-9] (detailing First Proof of Loss tracking history). Later that same day, Seahorse re-mailed the proof of loss (this time with the correct zip code) to Homesite. *See* Seahorse SOF ¶ 12. That Second Proof of Loss was delivered to Homesite on August 25, 2018. *See id.*

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the movant bears the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-movant. *See e.g.*, *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the movant satisfies its initial burden, the burden shifts to the non-movant to come forward with evidence that a genuine issue of material fact precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). Notably, assessments of credibility—no less than the weighing of evidence—are jury questions not susceptible of disposition at summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). The Court must

analyze the record as a whole—and not just the evidence the parties have singled out for consideration. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987). If there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

## ANALYSIS

Homesite moves for summary judgment on two grounds. *First*, it argues that Seahorse failed to submit a timely proof of loss *before* it filed suit. *See* Mot. at 8–11. *Second*, it says that, even if Seahorse had complied with the proof-of-loss requirement, its damages are barred by the SFIP's "Earth Movement Exclusion." *See id.* at 11–20.

### I.        The Proof-of-Loss Requirement

Homesite first contends that Seahorse failed to submit a timely proof of loss. *See id.* at 8–11. Seahorse, however, points out that it did send Homesite a proof of loss before it sued. *See* Resp. at 2–8 (discussing First Proof of Loss). And, Seahorse adds, even if the Court disregards its First Proof of Loss, the Second Proof of Loss was likewise timely—even though it came after Seahorse sued Homesite—because the Eleventh Circuit has never held that an SFIP claimant must submit its proof of loss *before* it files suit. *See id.* (citing *Sanz*, 328 F.3d at 1314; *Shuford v. Fid. Nat. Prop. & Cas. Ins. Co.*, 508 F.3d 1337, 1343 (11th Cir. 2007)). Instead, Seahorse argues, an SFIP claimant must submit its proof of loss before it can *recover money damages*. Thus, in Seahorse's view, so long as an SFIP claimant submits its proof of loss before damages are awarded, it can proceed against a WYO Carrier—even if its proof of loss was sent *after* suit was filed. On both grounds, Seahorse misreads the Contract.

In Article VIII, Section R, the Contract[4] provides as follows: "You may not sue us to recover money under this policy unless you have complied with all the requirements of the policy." Contract at 25. And Article VIII, Section J(4) makes clear that

4.      Within [one year of] the loss, send us a proof of loss, which is your statement of the amount you are claiming under the policy signed and sworn to by you and which furnishes us with the following information:

a.  The date and time of loss;

b.  A brief explanation of how the loss happened;

c.  Your interest (for example, "owner") and the interest, if any, of others in the damaged property;

d.  Details of any other insurance that may cover the loss;

e.  Changes in title or occupancy of the insured property during the term of the policy;

f.  Specifications of damaged insured buildings and detailed repair estimates;

g.  Names of mortgagees or anyone else having a lien, charge, or claim against the insured property;

h.  Details about who occupied any insured building at the time of loss and for what purpose; and

i.  The inventory of damaged personal property described in J.3. above.

Contract at 22. [5]

Seahorse sent the First Proof of Loss on July 23, 2018—seven days before it filed suit. *See* Seahorse SOF ¶ 9. But that First Proof of Loss was returned as undeliverable because Seahorse had entered the wrong zip code. *See id.* ¶ 11. So, Seahorse sent a Second Proof of Loss on August

---

[4] Again, as an SFIP policy, the Contract simply reiterates, word-for-word, the regulatory language.
[5] While the Contract says 60 days, FEMA extended this period to one year for SFIP claims arising from Hurricane Irma. *See* Letter from David I. Maurstad, Assistant Administrator for Federal Insurance (the "FEMA Extension") [ECF No. 33-9] at 2.

20, 2018—after it filed the Complaint—which Homesite received on August 25, 2018. *See id.* ¶ 12.

In two recent decisions, the Eleventh Circuit has carved out the outer limits of the SFIP's proof-of-loss requirements.[6] In *Sanz*, despite having failed to submit *any* proof of loss, the plaintiff contended that (i) the defendant was estopped from raising the proof of loss as a defense, and (ii) the defendant had waived its proof-of-loss arguments. *See Sanz*, 328 F.3d at 1318–21. The Eleventh Circuit disagreed. *Id.* at 1318. An "insured," it explained, "must adhere strictly to the requirements of the standard federal flood insurance policy before any monetary claim can be awarded against the government." *Id*. And, noting that "not even the 'temptations of a hard case' should cause courts to read the requirements of a federal insurance contract with 'charitable laxity,'" *id.* (citing *Merrill*, 332 U.S. at 386), the court concluded that the plaintiff's failure to comply with the proof-of-loss requirement constituted an absolute bar to recovery. *See id.* at 1320.

The *Shuford* Plaintiff had likewise "filed a claim [against the defendant] but never submitted a proof of loss." *Shuford*, 508 F.3d at 1341. In affirming the district court's entry of summary judgment, the Eleventh Circuit explained that the defendant "was entitled to summary judgment against Shuford's complaint for breach of contract because Shuford failed to file a proof of loss within a year." *Id.* at 1342.

---

[6] Seahorse cites *Jenkins v. U.S. Dept. of Housing & Urban Development*, 780 F.2d 1549, 1552 (11th Cir. 1986), for the proposition that "[c]ases are divided on whether failure to file a proof of loss on an FEMA policy is a per se condition precedent to bringing suit." Resp. at 5. In saying so, Seahorse conveniently omits the second half of the sentence: ". . . or whether waiver and estoppel may be asserted." *Jenkins*, 780 F.2d at 1552. Thus, even under *Jenkins*, an SFIP claimant's failure to comply with the proof-of-loss requirement constitutes either (i) a *per se* bar to suit, or else (ii) a bar subject to waiver and estoppel. But Homesite has not waived its right to challenge the timeliness of Seahorse's proof of loss here—nor has Seahorse argued that it has. And Seahorse never suggests that Homesite should be estopped from asserting that Seahorse's proof of loss was untimely. Even under *Jenkins*, then, Seahorse's claim is barred.

9

But, as Seahorse points out, because the plaintiffs in *Sanz* and *Shuford* never submitted *any* proofs of loss at all, those cases are not all that relevant to the two questions at issue here:[7] (1) whether, in mailing the First Proof of Loss to the wrong address, Seahorse "sen[t] [Homesite]" that proof of loss, Contract at 22; and (2) whether, in sending the Second Proof of Loss before the expiration of the Contract's one-year window, but after it filed suit, Seahorse "*adhere[d] strictly to the requirements of the [SFIP]*," *Shuford*, 508 F.3d at 1343; *see also Sanz*, 328 F.3d at 1318 ("[S]trict compliance with the provisions of [an SFIP] is required.").

### A. The Second Proof of Loss

The Court, Seahorse insists, need not engage in the difficult task of determining whether the First Proof of Loss was "sen[t] [to Homesite]" within the meaning of the Contract because, it says, the Second Proof of Loss was timely in any case. But, fairly read, the Contract suggests otherwise. *Cf.* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation.").

Under Article VIII, Section R of the Contract, "You [Seahorse] may not sue us [Homesite] to recover money under this policy *unless* you *have* complied with all the requirements of the policy." Contract at 25 (emphasis added). The combination of the conditional "unless" with the past-tense "have" makes clear that, before he files suit, an SFIP plaintiff must have *already*

---

[7] The same is true of all the other cases Homesite cites. *See* Mot. at 8 (citing *Dawkins v. Witt*, 318 F.3d 606, 609 (4th Cir. 2003) (proof of loss was not submitted within the required 60 days); *Mancini v. Redland Ins. Co.*, 248 F.3d 729, 734–35 (8th Cir. 2001) (proof of loss was not signed or sworn); *Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 397 (9th Cir. 2000) (proof of loss was not submitted within 60 days); *DeCosta v. Allstate Ins. Co.*, 730 F.3d 76, 84 (1st Cir. 2013) (proof of loss stated incorrect dollar amount); *Gowland v. Aetna*, 143 F.3d 951, 954 (5th Cir. 1998) (proof of loss not submitted); *Suopys v. Omaha Prop. & Cas.*, 404 F.3d 805, 808 (3d Cir. 2005) (proof of loss not submitted within 60 days); *Jacobson v. Metro. Prop. & Cas. Ins. Co.*, 672 F.3d 171, 176 (2d Cir. 2012) (proof of loss was incomplete)).

complied with the Contract's terms. Complying with those terms *after* filing suit, in other words, is not enough.

In its attempt to parry this conclusion, Seahorse cites Article VIII, Sec. J(4), which requires only that the proof of loss be sent within "one year" after the loss. *See* Resp. at 4–5. And, noting that a contract's more specific provisions should govern over its general ones, Seahorse contends that "the policy language does <u>not</u> purport to require, *as a mandatory precondition to filing suit*, that the POL be <u>first</u> submitted." Resp. at 4. Instead, Seahorse says, the Contract requires only that it be sent within "one year" after the loss—which, in this case, it was. *See id.*

But the Court should only employ the General/Specific Canon if the salient terms of the Contract are in conflict, *see* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 183 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails.")—which, in this case, they are not.

To understand why these two provisions do not conflict, consider for a moment a child who has a homework assignment due next week. On Friday night, the child asks his mother for permission to go out with his friends. The mother responds that "you cannot go out tonight **unless** you **have** completed all your assignments for next week." The conditions are unambiguous: Even though the homework assignment is not due until next week, the child may go out with his friends "tonight" *only* if he has completed his homework assignment *before* he goes out. And, it goes without saying, if the child were to go out with his friends tonight—but not complete his homework until, say, tomorrow (Saturday)—the child would have violated his mother's conditions, even if he did complete his assignment before its due date next week. As this example makes plain, the conditional "unless," when coupled with the past-tense "have," means "until." Seahorse, then, was not authorized to file suit [go out on Friday night] until it complied with all the conditions of the

Contract [completed its homework]—even if it ultimately ended up complying with those conditions within "one year after the loss" [before next week, when the assignment was due]. The two provisions of the Contract, in short, are not in conflict, and the Second Proof of Loss was untimely.

### B. *The First Proof of Loss*

Nevertheless, Seahorse *did* send a proof of loss on July 23, 2018—seven days before it sued Homesite.[8] Unfortunately for Seahorse, this First Proof of Loss does not save its claim.

To begin with, Seahorse failed to disclose the envelope in which the First Proof of Loss was sent.[9] Indeed, Homesite never even learned of the First Proof of Loss until it read about it in Seahorse's Response to Homesite's Motion for Summary Judgment. And, as soon as Homesite heard about this First Proof of Loss, it asked the Court to "disregard" it. Resp. at 5 ("Homesite requests the Court disregard Exhibit 8."). At oral argument, Seahorse argued that it did not have to produce the envelope because the Federal Rules govern only the disclosure of "documents"— and the "envelope," it insisted, was not a "document."

But the Federal Rules require a party to provide "a copy—or a description by category and location—of all documents . . . and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A)(ii). Seahorse does not explain why it thinks an envelope is not a "document." It almost certainly is. Merriam-Webster, after all, defines a document as:

---

[8] As we have already seen, this First Proof of Loss never reached Homesite because Seahorse entered the wrong zip code on the envelope.

[9] There is no concrete way of distinguishing between the first and the second proof of loss without the original envelope. Seahorse, after all, simply reprinted the First Proof of Loss and enclosed it in a second envelope after it received the first as undeliverable. It then held onto the First Proof of Loss—still enclosed within its envelope—until it attached a copy of the envelope (with the postage date) to its Response to Homesite's Summary Judgment Motion.

b: an original or official paper relied on as the basis, proof, or support of something;
c: something (such as a photograph or a recording) that serves as evidence or proof
2a: a writing conveying information . . .
b: a material substance (such as a coin or stone) having on it a representation of thoughts by means of some conventional mark or symbol . . . .

*Document*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary /document (March 10, 2020). Even if an envelope is not a "document," though, it is still a "tangible thing" that, given its centrality to the viability of Seahorse's claim, should have been produced under Rule 26.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Seahorse's failure to disclose the envelope was neither "substantially justified" nor "harmless."

The non-disclosure was not harmless because it forced Homesite to file both its Motion for Summary Judgment and its Statement of Material Facts without the benefit of knowing that the First Proof of Loss even existed. In practice, then, Seahorse's non-disclosure prevented Homesite from using *any* of the twenty pages it was allotted for its Motion—and *none* of the ten pages it was afforded for its Statement of Material Facts—on what has turned out to be the central issue in the case. And so, while Seahorse was able to rely on the First Proof of Loss as the primary thrust of both its Summary Judgment Response and its Statement of Material Facts, Homesite was left only *a portion* of its ten-page Reply.[10] Worse, the non-disclosure precluded Homesite from conducting

---

[10] The Court emphasizes that it was "only a portion" because Homesite had to use the balance of its Reply to rebut the other arguments Seahorse advanced in its Response.

any discovery[11] on either the authenticity of the envelope or the veracity of Seahorse's claimed submission of the First Proof of Loss. This is precisely the kind of litigation by surprise that the Federal Rules were designed, at least in part, to eradicate. *See Hickman v. Taylor*, 329 U.S. 495, 507 (1947) (the discovery rules "advance[] the stage at which the disclosure can be compelled . . . thus reducing the possibility of surprise"); *see also* FED. R. CIV. P. 1 ("These rules . . . should be construed, administered, and employed by the court and the parties to secure the ***just***, speedy, and inexpensive determination of every action and proceeding." (emphasis added)).

The non-disclosure was also not "substantially justified." At oral argument, Seahorse tried to explain the non-disclosure by suggesting that it did not fully appreciate the envelope's significance until it read Homesite's Motion for Summary Judgment. This cannot be. In fact, the timeliness of Seahorse's proof-of-loss submission has been a central issue since the very beginning of this case. *See* Answer [ECF No. 7] at 5 ("Plaintiff failed to meet its obligation to meet all conditions precedent prior to filing suit and breached the SFIP by failing to submit a timely signed and sworn proof of loss statement with supporting documentation in violation of Articles VIII(J) and (R) of the SFIP."). Nor does Seahorse dispute Homesite's representation—made at oral argument—that, at the deposition of Seahorse's 30(b)(6) witness, Homesite counsel asked several pointed questions on this very topic. Given all this, the envelope's import could not have been lost on Seahorse's (very experienced) counsel. And any suggestion that it was is belied by Seahorse counsel's decision to retain the undelivered and now-unusable envelope in its files—without producing it—until the very end of this litigation. Because, in sum, "[Seahorse] fail[ed] to provide

---

[11] The Court's discovery deadline expired on May 31, 2019, *see* Scheduling Order [ECF No. 25]— some four months before Seahorse finally disclosed the envelope.

information . . . as required by Rule 26(a) or (e), [Seahorse] is not allowed to use that information . . . to supply evidence on a motion." FED. R. CIV. P. 37(c)(1); *accord Cunningham v. Fulton Cty., Georgia*, 785 F. App'x 798, 803–04 (11th Cir. 2019) (affirming exclusion of evidence where defendants "didn't list these documents as part of their initial disclosures or supplement their disclosures thereafter. And, importantly, the district court found that the employees didn't give any explanation for their failure to disclose"); *Long v. E. Coast Waffles, Inc.*, 762 F. App'x 869, 871 (11th Cir. 2019) (finding that "untimely disclosures are certainly disfavored" and declining "to second-guess the district court's pre-trial discovery management"); *Cooley v. Great S. Wood Preserving*, 138 F. App'x 149, 161 (11th Cir. 2005) (affirming both trial court's exclusion of evidence and its refusal to permit the plaintiffs to supplement their discovery where "the plaintiffs neither listed the affiants of the contested affidavits in their initial disclosures under Rule 26(a), nor attempted to supplement their disclosures with this information under Rule 26(e)"); *Bearint ex rel. Bearint v. Dorell Juvenile Grp., Inc.*, 389 F.3d 1339, 1353–54 (11th Cir. 2004) (affirming trial court's exclusion of evidence, "[r]egardless of the importance of" the evidence, because "the reasons for the delay in the [plaintiff's] disclosure and the consequent prejudice that his testimony would have caused [the defendant]" were substantial).

But, even were the Court to consider the First Proof of Loss, its existence would not alter the result. Article VIII(J) of the Contract provides as follows:

**J.      REQUIREMENTS IN CASE OF LOSS**

…

4.      Within [one year of] the loss, send us a proof of loss, which is your statement of the amount you are claiming under the policy signed and sworn to by you and which furnishes us with the following information:

a.   The date and time of loss;

     b.   A brief explanation of how the loss happened;

     c.   Your interest (for example, "owner") and the interest, if any, of others in the damaged property;

     d.   Details of any other insurance that may cover the loss;

     e.   Changes in title or occupancy of the insured property during the term of the policy;

     f.   Specifications of damaged insured buildings and detailed repair estimates;

     g.   Names of mortgagees or anyone else having a lien, charge, or claim against the insured property;

     h.   Details about who occupied any insured building at the time of loss and for what purpose; and

     i.   The inventory of damaged personal property described in J.3. above.

Contract at 22.

The First Proof of Loss, Seahorse says, complied with these conditions because Article VIII(J) requires only that a proof of loss be "sent"—not that it be "received." *See* Resp. at 3–5. In saying so, Seahorse ignores the Article's requirement that the proof of loss be sent *to Homesite*.

Before explaining why this is so, the Court will briefly address Homesite's own tortured reading of the Contract—under which the insurer must receive the proof of loss at least 60 days before the claimant files suit. *See* Reply at 6–7. Homesite's reading is simply a recasting of FEMA's interpretation—which, Homesite contends, is essential to allow the insurer to "consider the proof of loss and either address it, pay it or reject it." Reply at 5. Relying on *Stinson v. United States*, 508 U.S. 36, 45 (1993) (employing *Auer* deference), Homesite asks the Court to defer to FEMA's reading of the SFIP.

But FEMA's interpretation is both inapposite and wrong. Courts must defer to an agency's interpretation of a regulation *only* when that regulation "is genuinely ambiguous." *Kisor v. Wilkie*,

139 S.Ct. 2400, 2415 (2019). But, when courts defer to an agency's interpretation of an *unambiguous* regulation, they "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000). Moreover, even when a regulation "is genuinely ambiguous," the agency's reading of that regulation must fall "within the bounds of reasonable interpretation." *Arlington v. FCC*, 569 U.S. 290, 296 (2013); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994). Homesite's argument fails under either test.

*First*, as Homesite conceded at oral argument—and as the Court explains in more detail below—the text of Article VIII(J), though perhaps not a model of clarity, is not "genuinely ambiguous." *Cf. Kisor*, 139 S. Ct. at 2415 ("[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n. 9 (1984)). *Second*, FEMA's interpretation is not "reasonable." Nowhere—not in Article VIII(J) or elsewhere—does the Contract ever suggest, expressly or otherwise, that an SFIP claimant must give the insurer a 60-day, post-proof-of-loss cushion before he may sue. As Homesite has been quick to point out, federal courts must "strictly construe" SFIP contracts. *Richmond*, 496 U.S. at 432. With this admonition in mind, the Court will not read into the SFIP a 60-day cushion that appears nowhere in the text of the Contract.

But Seahorse likewise mischaracterizes the Contract as "stat[ing] only that the [proof of loss] must be *sent* within 60 days (one year, here) of the loss." Resp. at 3 (emphasis added). To the contrary, the Contract requires the insured, within one year of a loss, to "send *us* a proof of loss . . . which *furnishes us* with the following information." Contract at 22 (emphasis added). The Contract defines "us" as "refer[ring] to the insurer," *id.* at 1—in this case, Homesite. And Homesite's address—including its zip code—is clearly listed on the first page of the Contract. *Id.*

Thus, while Seahorse may have "sent" the First Proof of Loss, it did not send that proof of loss *to Homesite* at the address listed in the Contract.

Seahorse contends that, according to the U.S. Postal Service's ("USPS") Domestic Mail Manual (the "DMM"), a mailing is not deficient simply because it contains an erroneous zip code—a proposition that, in Seahorse's view, renders its zip-code slipup a scrivener's error for which it should not be penalized. *See* Resp. at 3 n.4. Seahorse cites three cases in support of its reading of the DMM. *See id.* (citing *Santoro v. Principi*, 274 F.3d 1366, 1370 (Fed. Cir. 2001) ("The Mail Manual provides, inter alia, that a deliverable address need not contain a zip code at all."); *The Resolution Tr. Corp., as Receiver for Lincoln Sav. & Loan Ass'n, F.A. v. Bowen*, 92-CV-1671, 2008 WL 2001270, at *1 (D. Ariz. May 7, 2008) ("the United States Postal Service Domestic Mail Manual in effect in 1992 made the use of the zip code on mailing addresses voluntary and its omission did not render the mail undeliverable . . . ."); *Judkins v. Davenport*, 59 S.W.3d 689, 691 (Tex. App. 2000) (under the DMM, "a zip code may be omitted from certain items of mail, it is not a prerequisite to assuring that mail is properly routed to a particular addressee")). But each of these cases relied on a previous—and since-amended—version of the DMM.

Under the current DMM[12]—which governed in July 2018, when the First Proof of Loss was mailed—a zip code *was* required for *both* all "certified mail" and any "merchandise return service mail." Section 602.1.3.e.1, for instance, explains that "ZIP Codes are required on . . . merchandise return service mail." And Section 503.3.2.1.a provides that a "mailer of Certified Mail must: On Form 3800, enter the name and complete address of the person or firm to whom the mail is addressed." Removing any doubt, Section 602.1.4.2 defines "complete address" as

---

[12] *See* https://pe.usps.com/DMM300/Index.

including the "[c]orrect 5-digit ZIP Code or ZIP+4 code." Seahorse sent the First Proof of Loss via certified mail *with* merchandise return service. *See* First Proof of Loss. Far from advancing Seahorse's position, then, the DMM makes clear that Seahorse failed to send the First Proof of Loss *to Homesite*—an unsurprising conclusion given the "undeliverable" return of that proof of loss. Seahorse is wrong, in other words, when it attempts to distinguish its zip-code error from an error in the body of the mailing address—which, Seahorse appears to concede, *would* prevent a letter from being sent to its intended recipient. *See generally* Resp. at 3 n. 4.

Nor, in any event, did Seahorse "furnish [Homesite] with" the nine pieces of "information" listed in Article VIII(J)(4) of the Contract.[13] Contract at 22. At oral argument, Seahorse proffered that it had provided Homesite with the first *seven* of these in one or more of the three claims it submitted before it sent the First Proof of Loss. For two reasons, though, this pre-proof-of-loss "furnish[ing]" is insufficient here. *First*, the Contract unambiguously required Seahorse to provide Homesite with *all*—not some or even most—of these nine pieces of information within "one year" of the loss. *See id.* ("[S]end us a proof of loss, which is your statement of the amount you are claiming under the policy signed and sworn to by you and which furnishes us *with the following information*: . . . ." (emphasis added)). Second, the Contract unmistakably instructed Seahorse to include these nine pieces of information, not in a prior or subsequent claim form, but in the proof of loss itself. *See id.* ("[S]end us a proof of loss, . . . ***which*** furnishes us with the following

---

[13] These include: "(a) The date and time of loss; (b) A brief explanation of how the loss happened; (c) Your interest (for example, "owner") and the interest, if any, of others in the damaged property; (d) Details of any other insurance that may cover the loss; (e) Changes in title or occupancy of the insured property during the term of the policy; (f) Specifications of damaged insured buildings and detailed repair estimates; (g) Names of mortgagees or anyone else having a lien, charge, or claim against the insured property; (h) Details about who occupied any insured building at the time of loss and for what purpose; and (i) The inventory of damaged personal property described in J.3. above." Contract at 22.

information. . . ." (emphasis added)). And, while Seahorse may be forgiven for viewing these provisions—or the Court's interpretation of them—as hyper-technical or uncompromising, an "insured must *adhere strictly* to the requirements of the standard federal flood insurance policy before any monetary claim can be awarded against the government." *Sanz*, 328 F.3d at 1318–21 (emphasis added).

In short, even were the Court to excuse Seahorse's discovery violation, its reliance on the First Proof of Loss would remain unavailing.

## II.     The Earth Movement Exclusion

Homesite also argues that Seahorse's damages are excluded under the "earth movement exclusion" set out in Article V, Section C of the Contract. *See* Contract at 16–17. But, because Seahorse failed to "adhere strictly" to the Contract's conditions for filing suit, the Court need not address this exclusion here.

*** 

This is a hard case. Homesite cannot—and, to its credit, does not—suggest that it was somehow surprised by either the nature of Seahorse's claim or the amount of Seahorse's damages. Indeed, the parties had been engaged in protracted negotiations for many months before this lawsuit was filed. During those negotiations, it is undisputed, Seahorse sent Homesite no fewer than three different claim forms—each laying out precisely what was owed and why. By the time of the lawsuit, in other words, Seahorse's proof of loss was a mere formality. What's worse, Seahorse attempted, in good faith, to comply with the terms of that formality when it sent Homesite, not one, but two separate proofs of loss. On these facts, then, reasonable minds might

be excused for reproving the Court for engaging in a seemingly-draconian exercise of legal formalism.[14]

But, when it comes to SFIP claims, legal formalism is what the law requires. As the Supreme Court has explained, it is "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Merrill*, 332 U.S. at 385. SFIP claimants, therefore, must "strict[ly] compl[y]" with all SFIP conditions, *Shuford*, 508 F.3d at 1343, and must "adhere strictly" to all SFIP requirements, *Sanz*, 328 F.3d at 1318. "[N]ot even the 'temptations of a hard case' should cause courts to read the requirements of a federal insurance contract with 'charitable laxity.'" *Id.* at 1318 (quoting *Merrill*, 332 U.S. at 386).

Having carefully reviewed the record and the governing law, the Court hereby **ORDERS AND ADJUDGES** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 33] is **GRANTED**. The Plaintiff shall take nothing from this case.

2. The Court will enter an order of final judgment separately.

3. The Clerk of Court is directed to **CLOSE** this case.

4. Any pending motions are **DENIED AS MOOT**.

5. All pending deadlines are **TERMINATED**.

6. All pending hearings are **CANCELLED**.

---

[14] Indeed, had Seahorse voluntarily dismissed its own Complaint and then refiled, its new complaint would have been submitted *after*, rather than before, its proof of loss—thus avoiding this result.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 12th day of March 2020.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record